# EXHIBIT A

<u>**Execution Version**</u>

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>") is made and entered into as of October 23, 2013, by and between WALGREEN CO., an Illinois corporation ("<u>Buyer</u>"), and MERITUS ENTERPRISES, INC., a Maryland corporation (the "<u>Seller</u>").

WHEREAS, Seller is, among other things, engaged in the business (the "<u>Business</u>") of owning and operating the <u>two (2)</u> outpatient prescription pharmacies set forth on <u>Schedule A</u>, attached hereto (collectively known as the "<u>File Transfer Pharmacies</u>" and each a "<u>File Transfer Pharmacy</u>"), together with the <u>three (3)</u> buy-and-operate pharmacies set forth on <u>Schedule B</u>, attached hereto (collectively known as the "<u>Operate Pharmacies</u>" and each an "<u>Operate Pharmacy</u>" and together with the File Transfer Pharmacies, collectively the "<u>Pharmacies</u>"). The locations of each respective File Transfer Pharmacy set forth on the attached <u>Schedule A</u> (the "<u>File Transfer Pharmacy Premises</u>" and the locations of each respective Operate Pharmacy the "<u>Operate Pharmacy Premises</u>" together with the File Transfer Pharmacy Premises, collectively as the "<u>Premises</u>");

WHEREAS, Seller owns the Pharmacies and will materially benefit from the transactions contemplated by this Agreement; and

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, substantially all of the assets, properties and business related primarily to the Business, all on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I

## DEFINITIONS

1.1.    <u>Definitions</u>.  In this Agreement, the following terms have the meanings specified or referred to in this <u>Section 1.1</u>.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Anticipated Closing Date</u>" has the meaning set forth in <u>Section 5.1</u>.

"<u>Assumed Lease</u>" means the assumed lease (or assumed leases) related to each applicable Operate Pharmacy Premises between the Seller and the applicable Landlord dated the date thereof, together with all amendments, extensions and modifications agreed to between

1



Buyer and the applicable Landlords thereto and any similar documents, including the Lease Transfer Documents, not including the Operate Premises located at 13424 Pennsylvania Avenue, Suite 102, Hagerstown, Maryland.

"**Assumed Liabilities**" has the meaning set forth in Section 2.3.

"**Average Customer Prescriptions**" has the meaning set forth in Section 4.2(b).

"**Base Amount**" has the meaning set forth in Section 4.1.

"**Bill of Sale**" means a Bill of Sale, to be delivered by Buyer and Seller at Closing, in the form attached hereto as Exhibit A.

"**Business**" has the meaning set forth in the Recitals.

"**Business Employee**" has the meaning set forth in Section 6.11.

"**Buyer**" has the meaning set forth in the Preamble.

"**Closing**" means the closing of the transfer of the Purchased Assets from Seller to Buyer.

"**Closing Date**" means the time and date upon which the Closing actually occurs.

"**Closing Date Payment**" has the meaning set forth in Section 4.2(a).

"**Code**" has the meaning set forth in Section 4.3.

"**Confidential Information**" means, with respect to any Person, information regarding such Person that is not previously disclosed to the public or to the trade and includes information regarding, facilities, strategies, methods, trade secrets and other intellectual property, software, systems, procedures, operational policies, manuals, confidential reports, product price lists, pricing and cost policies, customer lists, inventory information, financial information (including revenue, costs or profits of the disclosing party), business plans, prospects, or opportunities.

"**Current Volumes**" has the meaning set forth in Section 6.9.

"**Data Converter**" has the meaning set forth in Section 8.3.

"**DEA**" means the United States Drug Enforcement Agency.

"**Encumbrance**" means any lien, encumbrance, claim, charge, security interest, assignment, collateral assignment, mortgage, pledge, easement, conditional sale or other title retention agreement, defect in title, covenant or other restrictions of any kind.

"**Environmental, Health and Safety Requirements**" means all Requirements of Law concerning or relating to public health and safety, worker/occupational health and safety,

2



and pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, threatened release, control, or other action or failure to act involving cleanup of any Hazardous Substances or wastes, chemical substances or mixtures, pesticides, pollutants, process waste water, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise, or radiation, each as amended and as now in effect, including: the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended; the Occupational Safety and Health Act of 1970, as amended; the Federal Water Pollution Control Act, as amended; the Federal Resource Conservation and Recovery Act, as amended; the Federal Clean Water Act, as amended; the Toxic Substances Control Act, as amended; the Federal Clean Air Act, as amended, and the Superfund Amendments and Reauthorization Act.

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Businesses**" has the meaning set forth in Section 8.14(a).

"**Excluded Contracts**" has the meaning set forth in Section 2.2(c).

"**Excluded Inventory**" has the meaning set forth in Section 2.2(b).

"**Excluded Liabilities**" has the meaning set forth in Section 2.4.

"**Expenses**" means any and all reasonable expenses incurred in connection with investigating, defending or asserting any claim, action, suit or proceeding incident to any matter indemnified against hereunder (including court filing fees, court costs, arbitration fees or costs, witness fees, and reasonable fees and disbursements of legal counsel, investigators, expert witnesses, accountants and other professionals).

"**File Transfer Current Volumes**" has the meaning set forth in Section 6.9(i).

"**File Transfer Pharmacy**" has the meaning set forth in the Recitals.

"**File Transfer Pharmacies**" has the meaning set forth in the Recitals.

"**File Transfer Pharmacy Premises**" has the meaning set forth in the Recitals.

"**Financial Statements**" has the meaning set forth in Section 6.4.

"**Governmental Body**" means any foreign, federal, state, local or other governmental authority or regulatory body.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, P. L. 104-191, and its implementing rules and regulations.



"**Hazardous Substances**" has the meaning set forth in Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, and will also expressly include petroleum, crude oil and any fraction thereof.

"**Intellectual Property**" means all (i) United States and foreign copyrights, copyrightable works and maskworks, whether registered or unregistered, and pending applications to register the same, (ii) United States and foreign patents, provisional patent applications, patent applications, continuations, continuations-in-part, divisions, reissues, patent disclosures, industrial designs, inventions (whether or not reduced to practice) or improvements thereto, (iii) United States, state and foreign trademarks, service marks, logos, trade dress and trade names, whether registered or unregistered, domain names, and pending applications to register the foregoing and (iv) confidential ideas, trade secrets, know-how, concepts, methods, processes, customer lists and other proprietary information.

"**Inventory Amount**" has the meaning set forth in Section 3.2.

"**Inventory Service**" has the meaning set forth in Section 3.2.

"**IOU Prescriptions**" has the meaning set forth in Section 8.5.

"**Landlord**" means the landlord party to the applicable Assumed Lease.

"**Lease Transfer Documents**" means documents, in form and substance reasonably acceptable to Buyer, evidencing the consent to the assignment of each Assumed Lease to Buyer and containing certain amendments to each Assumed Lease in order to conform each Assumed Lease to Buyer's standards.

"**LOI**" has the meaning set forth in Section 8.14(c).

"**Loss**" means any and all losses, costs, obligations, liabilities, settlement payments, awards, judgments, fines, penalties, damages, expenses, deficiencies or other charges.

"**NCPDP**" means the National Council for Prescription Drug Programs, Inc.

"**New Lease Agreement** " means that certain new lease agreement by and between Buyer and Dahbura Family Limited Partnership for the Operate Pharmacy Premises located at 13424 Pennsylvania Avenue, Suite 102, Hagerstown, Maryland.

"**Non-standard Business**" means (i) delivering prescriptions by mail, courier, automobile or other delivery system, (ii) compounding, including both sterile and non-sterile compounding, (iii) filling prescriptions that involve any unique, customized or non-standard packaging, including prescriptions filled for patients in independent living, assisted living, nursing home, long-term care or hospice facilities, (iv) any business conducted pursuant to Section 340B of the Public Health Service Act, (v) any non-prescription business (including durable medical equipment) done through any of the Pharmacy's computer system and included in its prescription count (including the Current Volume), (vi) any prescriptions filled pursuant to any contract, agreement or understanding with any Person or Payment Program, or (vii) any

4



other business outside the scope of a customary prescription pharmacy or retail drug-store business.

"**Operate Pharmacy Current Volumes**" has the meaning set forth in Section 6.9(ii).

"**Operate Pharmacy**" has the meaning set forth in the Recitals.

"**Operate Pharmacies**" has the meaning set forth in the Recitals.

"**Operate Pharmacy Premises**" has the meaning set forth in the Recitals.

"**Payment Programs**" has the meaning set forth in Section 6.13(c).

"**Permits**" has the meaning set forth in Section 2.1(g).

"**Person**" means any individual, corporation, partnership, joint venture, trust, Governmental Body or other organization or entity.

"**Personal Property**" has the meaning set forth in Section 2.1(a).

"**Pharmacies**" has the meaning set forth in the Recitals.

"**PHI**" has the meaning set forth in Section 8.7.

"**Power of Attorney**" has the meaning set forth in Section 8.15(c).

"**Premises**" has the meaning set forth in the Recitals.

"**Purchase Price**" has the meaning set forth in Section 4.1.

"**Purchased Assets**" has the meaning set forth in Section 2.1.

"**Purchased Inventory**" has the meaning set forth in Section 2.1(c).

"**Record Data**" has the meaning set forth in Section 8.3.

"**Records**" has the meaning set forth in Section 2.1(b).

"**Requirements of Law**" means any foreign, federal, state and local laws, statutes, regulations, rules, codes or ordinances enacted, adopted, issued or promulgated by any Governmental Body.

"**Rx Inventory**" has the meaning set forth in Section 2.1(c).

"**Seller**" has the meaning set forth in the Preamble.

"**Shared Expense Credit**" has the meaning set forth in Section 13.7(b).



"**Tax**" means, all U.S. federal, state or local or foreign Taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, gross receipts, gains (including capital gains), sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security (or similar), unemployment, unclaimed property, premium, fringe benefits, goods and services, debits, windfall or excess profits, environmental (including Taxes under Section 59A of the Code), unincorporated business, information, disability, workers compensation, production, registrations, alternative or add-on minimum, accumulated earnings, personal holding, escheat payments, excise, severance, stamp, occupation, property and estimated Taxes, customs duties, and other governmental charges of any kind whatsoever, together with all interest, penalties, fines, additions to Tax or additional amounts imposed by any taxing authority with respect to such amounts.

"**Tax Return**" means any declaration, return, amended return, claim for refund, report, statement, information return or other document (including any related or supporting information) filed or required to be filed with any governmental entity in connection with the determination, assessment, collection or administration of any Taxes or the administration of any laws, regulations, or administrative requirements relating to any Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Transferable Permits**" has the meaning set forth in <u>Section 8.15(a)</u>.

"**Transferred Employee**" has the meaning set forth in <u>Section 8.2(a)</u>.

"**Verification Date**" has the meaning set forth in <u>Section 4.1</u>.

"**Verification Date Volume**" has the meaning set forth in <u>Section 4.1</u>.

1.2.    <u>Interpretation</u>.  Article titles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.  The Schedules and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein.  Any agreement referred to herein shall mean such agreement as amended, supplemented and modified from time to time to the extent permitted by the applicable provisions thereof and by this Agreement.  As used in this Agreement, the word "including" means "including without limitation."

## ARTICLE II

## PURCHASE AND SALE

2.1.    <u>Purchased Assets</u>.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances, all of the assets and properties of Seller used in connection with the operation of the Business (other than the



Excluded Assets), as the same shall exist on the Closing Date (collectively, the "Purchased Assets"), including all right, title and interest of Seller in, to and under:

(a)     Any and all personal property, as defined herein and set forth in Schedule 2.1(a), used in the conduct of the Business, including all furniture, fixtures (and fittings thereon), equipment, signage, satellite and other communications equipment and leasehold improvements used in the Business , including those listed on Schedule 2.1(a) (collectively, the "Personal Property");

(b)     Any and all prescriptions, prescription files and records, customer lists and patient profiles, including refill status reports and insurance coverages, co-pay and payment records, including any files or records maintained electronically and any files or records added between the date of this Agreement and the date of transfer (collectively, the "Records");

(c)     Except for the Excluded Inventory, all items in each Pharmacy's stock of prescription pharmaceutical inventory ("Rx Inventory") identified as inventory to be included in the Purchased Assets on Exhibit B (the "Purchased Inventory");

(d)     All Intellectual Property used in the operation of each Pharmacy and owned by Seller, including all rights in and to the name "Home Care Pharmacy" and all derivatives thereof, all software, operating systems, internet sites, domain names and logos pertaining to such name (and all goodwill associated with such Intellectual Property), and all telephone and facsimile numbers of each Pharmacy;

(e)     Each Assumed Lease and any rent credits, tenant improvement credits and allowances paid or made under each Assumed Lease;

(f)     All easements, rights-of-way, and other appurtenants to each of the Operate Premises;

(g)     To the extent transferable, all licenses, franchises, permits, approvals and other authorizations and similar rights (such as state pharmacy board and DEA licenses and Medicare, Medicaid and NCPDP numbers) primarily used in or related to the ownership or operation of each Operate Pharmacy obtained from any Governmental Bodies (collectively, the "Permits");

(h)     [Reserved]

(i)     Copies of all other books and records of Seller relating primarily to the assets, properties and operations of the Business or otherwise necessary to effectuate the intention of this Agreement;

(j)     A computer from each Pharmacy with access to the Records, that are maintained electronically and an attached printer;

7



(k)     Any guarantees, warranties, indemnities and similar rights relating to Purchased Assets; and

(l)     All of the other assets and properties primarily used in or related to the ownership or operation of each Pharmacy or located on each respective Premise.

2.2.    Excluded Assets.   Notwithstanding the provisions of Section 2.1, the Purchased Assets shall not include the following (collectively, the "Excluded Assets"):

(a)     All cash and cash deposits and accounts receivable, including insurance receivables, of Seller or the Business;

(b)     The excluded inventory described on Exhibit B (the "Excluded Inventory");

(c)     All agreements, contracts and understandings of Seller (except for the Assumed Leases) (collectively, the "Excluded Contracts");

(d)     All employee benefit plans, programs or arrangements and all contracts of insurance;

(e)     All corporate minute books and the corporate seal of Seller;

(f)     All assets primarily used in or related to the ownership or operation of any business owned and operated by Seller that is not related to or associated with the Business;

(g)     All refunds or credits of any Tax for which the Seller is liable or to which the Seller are entitled pursuant to Section 8.8;

(h)     All security deposits paid by Seller to secure a lease to the each of the Premises (as the case may be); provided, that Seller shall have the sole responsibility for obtaining all such security deposits and Seller acknowledges and agrees that Buyer shall have no obligation to assist Seller in obtaining such security deposits; and

(i)     Any other assets set forth on Schedule 2.2(i).

2.3.    Assumed Liabilities.   As additional consideration for the Purchased Assets, at the Closing Buyer shall assume the obligations of Seller under each the Assumed Lease arising after the Closing Date (the "Assumed Liabilities").

2.4.    Excluded Liabilities.   Except for the liabilities expressly assumed by Buyer as Assumed Liabilities, notwithstanding anything contained in this Agreement to the contrary, Buyer shall not assume or be obligated to pay, perform or otherwise discharge any other liability of Seller whatsoever, regardless of whether any such liabilities or obligations are absolute or contingent, choate or inchoate, liquidated or unliquidated, or otherwise (collectively,



the "Excluded Liabilities"). Seller shall remain liable for all Excluded Liabilities, including any obligations arising prior to Closing, any liabilities related to any Excluded Contracts or other Excluded Assets and any liabilities arising under the Assumed Lease prior to the Closing Date. Without limiting the generality of the foregoing, in no event shall Buyer assume (a) any obligations of Seller under HIPAA or other applicable laws or regulations, including the HIPAA privacy standard requiring accounting of certain disclosures of PHI made by Seller prior to the Closing Date, or (b) any type of successor liability as to trade creditors, unemployment, income, property, sales or other taxes, or otherwise, it being understood that all such liabilities are Excluded Liabilities.

## ARTICLE III

## VALUATION OF INVENTORY

3.1.    <u>Purchased Inventory; Handling of Excluded Inventory.</u>   The parties understand that Buyer will purchase, and the Purchased Assets will include only those items of inventory that are determined to be Purchased Inventory according to the procedures set forth on <u>Exhibit B</u> and that Buyer will not purchase any Excluded Inventory. To the extent possible, Seller shall physically separate all items of Excluded Inventory from the Purchased Inventory prior to Closing. All Excluded Inventory shall be removed from each of the Premises at Seller's expense promptly but no later than twenty-four (24) hours following Closing.

3.2.    <u>Valuation of the Purchased Inventory.</u>   The parties shall commission Washington Inventory Service, RGIS or another mutually acceptable inventory valuation firm (the "Inventory Service") to conduct a full review and valuation of the Purchased Inventory using the methods, standards and procedures set forth in <u>Exhibit B</u> and to determine the aggregate value of the Purchased Inventory as of the Closing Date (such value, the "Inventory Amount"). Prior to such review and valuation, Seller shall label all items included in the Seller's stock of Rx Inventory with the Seller's actual acquisition cost for the Rx Inventory. The value of the Inventory Amount shall be determined in accordance with the valuation procedures set forth on <u>Exhibit B</u>; provided, that in no event shall the Inventory Amount (i) for the File Transfer Pharmacies exceed the amounts for each respective File Transfer Pharmacy set forth on <u>Schedule A</u> attached hereto, and (ii) the Operate Pharmacies exceed the amounts for each respective Operate Pharmacy set forth on <u>Schedule B</u> attached hereto.

## ARTICLE IV

## PURCHASE PRICE, PAYMENT AND ALLOCATION

4.1    <u>Purchase Price.</u>   The purchase price (the "Purchase Price") for the Purchased Assets and the covenants and agreements set forth herein shall be an amount equal to One Million Ninety-Three Thousand Nine Hundred Ninety-Six Dollars and No/100 ($1,093,996.00) (the "Base Amount"), plus the Inventory Amount. The parties further agree that the Base Amount will decrease in the event there is a reduction in the average daily prescription count at any of the Pharmacies between the date of this Agreement and the Closing Date, which

9



decrease shall be calculated as follows: (a) on a date within fifteen (15) days of Closing (such date the "Verification Date") the parties shall measure, using the same procedures as used in measuring the Current Volumes, the average daily prescription count at each Pharmacy for the four (4)-week period prior to the Verification Date to be compared it to the comparable four (4)-week period in the prior year (such count, the "Verification Date Volume"); and (b) in the event the Verification Date Volume for the Pharmacies is less than the Current Volume for the respective Pharmacies by five (5) percent or more, then the Base Amount shall be reduced proportionally upon calculation of the total Current Volume at all of the Pharmacies, without regard to the initial five (5) percent reduction. Solely for the purpose of example, if the decrease between the Current Volume and Verification Date Volume of all Pharmacies is twenty-five (25) percent, then the decrease of the Base Amount would be twenty (20) percent. Buyer's calculation of any of the Verification Date Volumes shall be conclusive.

      4.2    Payment of the Purchase Price. Subject to Section 9.1, Buyer will pay the Purchase Price as follows:

      (a) The Base Amount, less the Shared Expense Credit, shall be paid at Closing by wire transfer of immediately available funds to an account or accounts designated by Seller pursuant to the wire transfer instructions provided on Exhibit E (such payment, the "Closing Date Payment"). In the event that complete wire transfer instructions are not provided to Buyer at least two (2) business days prior to the Closing, Buyer shall have the option of not wiring the Closing Date Payment until two (2) business days following receipt of the Seller's wire transfer instructions, even if such date is after the Closing Date.

      (b) Buyer shall pay an amount equal to the Inventory Amount within three (3) business days after Buyer's receipt of complete inventory report of each Pharmacy, prepared in accordance with Article II (which report shall identify the Purchased Inventory and set forth the Inventory Amount) and signed by representatives of Seller, Buyer and the Inventory Service, by wire transfer of immediately available funds to an account specified by Seller.

      4.3    Allocation of the Purchase Price. The Purchase Price will be allocated for Tax purposes in the manner required by Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"), as follows:

      (a) An amount equal to the Inventory Amount determined shall be allocated to the Purchased Inventory;

      (b) An amount equal to twenty percent (20%) of the Base Amount shall be allocated to the restrictive covenants set forth in Section 8.14, to be allocated among the covenantors at their discretion; and

      (c) The remaining eighty percent (80%) of the Base Amount shall be allocated as follows: (i) an amount equal to the Seller's net book value for the



Personal Property, as set forth in the Financial Statements, shall be allocated to the Personal Property and (ii) the remainder shall be allocated to the Purchased Assets other than Inventory and Personal Property.

Buyer and Seller further agree to comply with all filing, notice, and reporting requirements described in Section 1060 of the Code and the regulations promulgated thereunder, including the timely preparation and filing of Internal Revenue Service Form 8594 in accordance with these allocations. Buyer and the Seller hereby agree that they will report the federal, state and other Tax consequences of the transaction contemplated by this Agreement in a manner consistent with these allocations.

4.4     <u>Premise Post-Closing Adjustment</u>.  Buyer and Seller agree that if, during the period commencing on the Closing Date and continuing through the period ending on the date that is the twelve (12)-month anniversary of the Closing Date, Seller or any entity owned by Meritus Medical Center, Inc., or Meritus Enterprises, Inc., any File Transfer Premises for, or in connection with any outpatient retail drug store, or outpatient retail pharmaceutical operation, then Seller shall reimburse Buyer an amount equal to twenty percent (20%) of the Base Amount (and the Base Amount shall be reduced by that amount for all purposes of this Agreement) within five (5) business days of notice by Buyer to Seller of such restricted use of any of the File Transfer Premises by wire transfer of immediately available funds to an account or accounts specified by Buyer.  Seller represents and warrants it shall not terminate, lease, sublease or assign any File Transfer Premises to an entity not owned by Meritus Medical Center, Inc. or Meritus Enterprises, Inc. for a one (1) year period after the Closing of this Agreement.

## ARTICLE V

## CLOSING

5.1.     <u>Closing Date</u>.  The Closing shall be consummated as promptly as practicable following satisfaction of the conditions precedent contained herein, at a date and time mutually agreed upon by the parties.  Assuming the satisfaction of the conditions precedent set forth in this Agreement on or before such date, the Closing will occur on or before December 13, 2013 (the "<u>Anticipated Closing Date</u>") or another mutually agreeable date; provided, that the parties agree that in order to facilitate a smooth transition of the Business to Buyer, Buyer shall have the right to delay the Closing until forty-five (45) days following the Anticipated Closing Date in its sole discretion.

5.2.     <u>Buyer's Closing Deliveries</u>.  Prior to or at Closing, Buyer shall deliver to Seller each of the following:

(a)     An amount equal to the Closing Date Payment, by wire transfer of immediately available funds to the accounts specified by Seller;

(b)     The Bill of Sale, duly executed by an authorized officer of Buyer;

11



(c)     The Power of Attorney, duly executed by an authorized officer of Buyer;

(d)     The Lease Transfer Documents, duly executed by an authorized officer of Buyer; and

(e)     Such other instruments or documents as may be necessary or appropriate to carry out the transactions contemplated hereby.

5.3.     <u>Seller's Closing Deliveries</u>.  Prior to or at Closing, Seller shall deliver to Buyer each of the following:

(a)     Possession of the Purchased Assets;

(b)     Evidence of the release of any and all Encumbrances encumbering any of the Purchased Assets (including any required UCC termination statements, bank pay-off letters or similar documents);

(c)     Certificate of the secretary or an assistant secretary of the Seller, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyer, as to (i) the Certificate of Incorporation of the Seller; (ii) the by-laws of the Seller; (iii) the authority of Seller regarding the due execution and performance of this Agreement and the contemplated transactions; (iv) the good standing of the Seller in the State of Maryland; and (v) incumbency and signatures of the officers of the Seller executing this Agreement and any document or agreement required to be delivered hereunder;

(d)     All Record Data, in accordance with <u>Section 8.3</u>;

(e)     The Bill of Sale, duly executed by an authorized officer of the Seller;

(f)     The Lease Transfer Documents, duly executed by authorized officers of Seller and authorized officers of each applicable Landlord;

(g)     An Estoppel Certificate related to each Assumed Lease, in the form and substance reasonably acceptable to Buyer, duly executed by authorized officer of Seller and authorized officers of Landlord;

(h)     An opinion of counsel to Seller, in the form of <u>Exhibit C</u>;

(i)     Any documents required to be delivered by Seller under <u>Section 8.7</u>;

(j)     An IRS Form W-9 for Seller;

(k)     [Reserved]



(l)     Fourteen (14) days prior to the Closing, the Power of Attorney, duly executed by an authorized officer of the Seller;

(m)     Fourteen (14) days prior to the Closing Date, Seller shall execute and return to Buyer the NCPDP Termination Notification attached hereto as <u>Exhibit H</u>;

(n)     A list of each Transferred Employee's health and dental insurance deductible and amount of the deductible that has been met by such Transferred Employee and any covered dependent in the current calendar year, through the date of Closing;

(o)     An executed original of the Letter Agreement to Restrict the Premises by and between the Seller and the Seller's applicable landlord at the File Transfer Premises, which shall restrict each Seller's landlord from permitting the applicable File Transfer Premises to be used as a retail outpatient pharmacy for one (1) year following the Closing Date, in form and substance agreeable to Buyer (the "<u>Letter Agreement to Restrict the Premises</u>"), attached hereto as <u>Exhibit K</u>; and

(p)     The certificate contemplated by <u>Section 11.2(f)</u>.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller represents and warrants to Buyer and agrees as follows:

6.1.    <u>Organization and Authority</u>.   The Seller is a corporation duly organized and in good standing under the laws of the State of Maryland and is qualified to do business in and in good standing in all other jurisdictions in which the Seller conducts business.  Seller has the power and other authority to execute, deliver and perform this Agreement.  The Seller owns all of the outstanding equity interests in the Business.  This Agreement and the transactions contemplated hereby have been approved by the Seller and by the Board of Directors (or other governing body) of the Seller and, when fully executed and delivered, this Agreement and all documents and agreements required to be delivered hereunder, will be legal, valid and binding obligations of Seller enforceable in accordance with their terms, in each case subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general application relating to or affecting creditors' rights and to general equity principles.

6.2.    <u>No Conflicts</u>. The execution, delivery and performance of this Agreement by Seller does not and will not (a) constitute a breach of any contract to which any Seller is a party, (b) conflict with any order from a governmental body or any laws to which any of the Purchased Assets is subject or by which any Seller is bound, or (c) require the approval, consent, authorization or act of, or the making by any Seller of any declaration, filing or registration with, any Person.  Seller has not made an assignment for the benefit of creditors and is not subject to



the jurisdiction of any bankruptcy court nor has it entered into any other arrangement or composition with creditors that would impede, prohibit or govern the disposition of its assets.

6.3   <u>Taxes</u>. Seller has, in respect to the Business, filed all Tax Returns that are required to be filed and have paid all Taxes that have become due pursuant to such Tax Returns or pursuant to any assessment that has become payable or for which Buyer may otherwise have any transferee liability. Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owed to any employee, independent contractor, creditor, holders of equity interests or other third party. There are no Tax examinations or audits of any Seller pending or threatened; and no waivers or extensions of statutes of limitations with respect to any Taxes of Seller have been requested or given. The Seller's Federal Employer Identification Number is 52-1393624 and its State of Maryland Sales and Use Tax is 03411654 (HCP Robinwood 03411654; HCP Williamsport 09163922; HCP Smithsburg 05719798; HCP Hager Park 08204059; ). The state tax unemployment account number for the Seller is 0053341357and a copy of the most current State Unemployment Tax Rate Notice for the Seller is attached as <u>Schedule 6.3</u>.

6.4   <u>Financial Statements</u>. Set forth on <u>Schedule 6.4</u> are (i) the Seller's balance sheet as of June 30, 2011 and June 30, 2012 and related statements of income and cash flows for the years then ended, together with any applicable footnotes, and (ii) the Seller's balance sheet as of August 31, 2013 and related statements of income and cash flows for the twelve (12)-month period then ended, together with any applicable footnotes (collectively, the "<u>Financial Statements</u>"). The Financial Statements (i) fairly present, in all material respects, the financial condition and operating results of the Seller as of the date and for the periods indicated therein, and (ii) have been prepared as a compilation on an income tax basis. Except as reflected in the Financial Statements, there have not been any events, occurrences, changes or developments, in each case which, individually or in the aggregate, have had or could reasonably be expected to have a material adverse effect on the Business taken as a whole.

(a)   Except as set forth on <u>Schedule 6.4</u>, during the period between preparation of the Financial Statements and the date hereof, inclusive, there has not been any material adverse effect on the Business or the Purchased Assets, and no fact or condition exists or, to the knowledge of Seller, is threatened that might reasonably be expected to have a material adverse effect.

(b)   Except as set forth on <u>Schedule 6.4</u>, since the preparation of the Financial Statements, Seller has conducted the Business only in the ordinary course and in conformity with past practice. Without limiting the generality of the foregoing, since preparation of the Financial Statements, except as set forth on <u>Schedule 6.4</u>, Seller has not taken any action that, if taken after the date hereof, would have constituted a violation of <u>Section 8.1</u>.

6.5   <u>Title and Sufficiency</u>. The Seller has full legal, equitable and marketable title to all of the Purchased Assets, free and clear of all Encumbrances. At Closing, the Seller will transfer to Buyer full legal, equitable and marketable title to all of the Purchased Assets. No Purchased Asset is titled in a Person other than the Seller. Except for the Excluded

14



Assets, the Purchased Assets constitute all the assets necessary for the operation of the Business as currently conducted.  Other than Excluded Assets, there are no assets or property of any nature that are being retained after the Closing Date by Seller or any of its  Affiliates which have been used in the Business.

6.6     Contracts.  Schedule 6.6 sets forth a list of all contracts, agreements and understandings related to the Business.

6.7     Personal Property.  Schedule 2.1(a) contains a complete and accurate list of all furniture, fixtures, equipment, satellite and other communications equipment, leasehold improvements, signage and other Personal Property used in the Business.  The Personal Property is and shall be as of the Closing Date in good working order and condition, free of defect or damage, ordinary wear and tear excepted.  Between the date hereof and Closing, there will not be a material reduction in the Personal Property listed on Schedule 2.1(a).

6.8     Inventory.  The Purchased Inventory is in good, merchantable and useable condition, and consists only of items of quality and quantity commercially usable and salable in the ordinary course of the Business, except for any items of obsolete material or material below standard quality excluded under Exhibit B.  The present quantities of all items included in each Pharmacy's stock of Rx Inventory are reasonable in the present circumstances for the Business.

6.9     Prescriptions.  As of the date of this Agreement the average daily prescription count of (i) each File Transfer Pharmacy is at least the number of prescriptions set forth for each respective File Transfer Pharmacy on the attached Schedule A, together as (the "File Transfer Pharmacy Current Volumes"), and (ii) each Operate Pharmacy is at least the number of prescriptions set forth for each respective Operate Pharmacy on the attached Schedule B, together as the ("Operate Pharmacy Current Volumes" and collectively with the File Transfer Pharmacy Current Volumes, collectively the "Current Volumes").  The prescriptions filled at each Pharmacy have arisen from bona fide, legal transactions and the information included in the Records is accurate in all material respects.  Except as set forth on Exhibit F, none of the prescriptions filled at any of the Pharmacies result from any Non-standard Business.

6.10    Intellectual Property.  Seller does not own, use or license any registered Intellectual Property in connection with the Business.  No consent on the part of, notice to or filing with any other Person is necessary in connection with the transfer to Buyer of any Intellectual Property.  No royalty is payable to any Person as a result of, or with respect to, the use of any Intellectual Property.  To Seller's knowledge, the operation of the Business as currently conducted does not infringe, misappropriate or conflict with any intellectual property right or other legally protectable right of another Person.  Seller has not received any notice of any claim by another Person contesting the validity, enforceability, use or ownership of any of its Intellectual Property, nor has Seller received any notice of any grounds for the same.  Seller has not granted any license or other right or interest in or to any Intellectual Property.  Schedule 6.10 contains a list of all Intellectual Property owned by or licensed to Seller that are used in the Business.

15



6.11    Employee Matters. Set forth on Schedule 6.11 is a list of all employees of the Business on the date hereof (each, a "Business Employee"), including their full legal name, full hire date, position, salary, bonus and other compensation information and, in the case of pharmacists, nurses or other licensed Persons, their relevant license numbers. Schedule 6.11 also identifies all oral or written employee benefit plans, programs or arrangements maintained by Seller for the benefit of any of the employees of the Business. Except as set forth on Schedule 6.11, Seller is not bound by any oral or written employment agreement, consulting agreement, or deferred compensation agreement. None of any Seller or any employee of Seller is a party to any collective bargaining agreement. Seller is not and has never been subject to any affirmative action obligations under any Requirements of Law with respect to any current or former employees, including Executive Order 11246, or is or has been a government contractor for purposes of any Requirements of Law with respect to the terms and conditions of employment of any current or former employees.

6.12    Legal Proceedings. There are no (a) claims, actions, suits or proceedings pending or, to the best of Seller's knowledge, threatened by or against Seller relating to or affecting the Business or the Purchased Assets, or (b) judgments, decrees, orders, writs, injunctions, rulings, decisions or awards of any court or Governmental Body to which Seller is a party or is subject with respect to the Business or to which any of the Purchased Assets is subject. Seller does not know or have any grounds to know of any basis for any such action or of any governmental investigations relating to the Business or the Purchased Assets. Seller has received no notice of complaints filed against Seller under HIPAA or applicable patient privacy and data protection laws and, to Seller's knowledge, no such violation exists.

6.13    Compliance With Law; Permits; Medicare and Medicaid.

(a) Seller has obtained all licenses, franchises, permits, approvals and other authorizations from a Governmental Body that are necessary to entitle Seller to own or lease, and operate and use the Purchased Assets and to carry on the Business as currently conducted. Schedule 6.13 sets forth a list and brief description of all Permits, including all state pharmacy board and DEA licenses and all NCPDP, Medicare, Medicaid or other billing or similar numbers used in the Business.

(b) Seller is not in violation, and has not been in violation in the preceding three years, of any Requirements of Laws with respect to the Business. Seller has timely filed all material reports, registrations and statements required to be filed by it with any Governmental Body, and has paid all related fees and assessments due and payable. Seller has not, and no one acting on behalf of Seller has, to the knowledge of Seller, received or filed for any Medicare or Medicaid overpayments. All Medicare, Medicaid and third-party reports and claims filed or required to be filed by or on behalf of Seller have been timely filed and are complete and accurate in all material respects. Such reports and claims properly claim and disclose all information and other items to be disclosed for the periods covered thereby. Neither Seller, nor any director, officer or employee of Seller or any Affiliate of Seller has been excluded from participation in any government healthcare payment program, including Medicare or Medicaid, nor are any of the foregoing Persons aware of any pending or threatened investigation or government action that may lead to such exclusion, fine or other remedy.



(c) Without limiting the generality of the foregoing,

 (i) there is no pending or, to the knowledge of Seller, threatened, lawsuits, claims, suits, or other proceedings relating to the Business or any of the Pharmacy's participation in any payment program, including Medicare, TRICARE, Medicaid, worker's compensation, Blue Cross/Blue Shield programs, and all other health maintenance organizations, preferred provider organizations, health benefit plans, health insurance plans, and other third party reimbursement and payment programs (the "Payment Programs");

 (ii) to the knowledge of Seller, (x) no Payment Program has requested or threatened any recoupment, refund, or set-off from the Business except in the ordinary course of the Business consistent with past practice; and (y) since October 1, 2003, no Payment Program has imposed a fine, penalty or other sanction on Seller and Seller has not been excluded or suspended from participation in any material Payment Program.

 (iii) Since October 1, 2003, Seller has not, and to the knowledge of Seller, no employee, with respect to actions taken in connection with their employment by Seller, (A) has been assessed a civil money penalty under Section 1128A of the Social Security Act or any regulations promulgated thereunder, (B) has been excluded from participation in any federal health care program or state health care program (as such terms are defined by the Social Security Act), including Medicare or Medicaid, nor, to the knowledge of Seller, are any of the foregoing Persons aware of any pending or threatened investigation or government action that may lead to such an exclusion, (C) has been convicted of any criminal offense relating to the delivery of any item or service under a federal health care program relating to the unlawful manufacture, distribution, prescription, or dispensing of a prescription drug or a controlled substance, (D) has failed to comply with the requirements of Section 340B of the Public Health Service Act, (E) is now or has ever been listed on the office of the Inspector General's excluded persons list, or (F) has been a party to or subject to any action concerning any of the matters described above in clauses (A) through (E).

(d) To Seller's knowledge, (i) the Business is in compliance with all Environmental, Health and Safety Requirements in connection with the ownership, use, maintenance or operation of the Assets; (ii) each location at which the Seller operates (including each of the Premises), or has operated, the Business is in compliance in all material respects with all Environmental, Health and Safety Requirements; and (iii) there are no pending or threatened allegations by any Person that any of the Purchased Assets are not, or that the Purchased Business has not been conducted, in compliance with all Environmental, Health and Safety Requirements and Seller has not received any notice, report, or information (including information that litigation, investigation or administrative action of any kind are pending or threatened) regarding any actual or potential liabilities or any corrective, investigatory, or remedial obligations, arising under Environmental,



Health and Safety Requirements relating to the Business or the use of any of the Purchased Assets. No Hazardous Substances have been or are currently located at, in, under, or about, either the Purchased Assets or any other property currently or previously owned or operated by Seller (including each of the Premises) in a manner that: (i) violates in any material respect any applicable Environmental, Health and Safety Requirements or (ii) requires response, remedial, corrective action or cleanup of any kind under any applicable Environmental, Health and Safety Requirements.

6.14   <u>Warranties</u>. To the best of Seller's knowledge all pharmaceuticals and other products marketed, sold, distributed, delivered or licensed by the Seller or its Affiliates with respect to the Business at any time since October 1, 2003 have been in conformity, in all material respects, with all applicable contractual commitments and express or implied warranties.

6.15   <u>Real Property and Leaseholds</u>. Except for each of the Operate Premises, Seller does not own, beneficially or of record, or lease any real property used in the Business. Each Assumed Lease comprises all leasehold interests in each of the applicable Operate Premises. Seller has not pledged, encumbered or hypothecated its right, title or interest in or to any Assumed Lease or any of the Operate Premises. Seller has provided Buyer with true and correct copies of the Assumed Lease. Upon obtaining the Lease Transfer Documents, Seller will transfer to Buyer Seller's interest in the leasehold estate covered by each Assumed Lease free of any Encumbrance granted by Seller. Seller enjoys peaceful and undisturbed possession of each of the Operate Premises, and Seller has in all material respects performed all the obligations with respect to each Assumed Lease required through the date of this Agreement to be performed by it.

6.16   <u>Third Party Payors</u>. Set forth in <u>Schedule 6.16</u> are the names and addresses of the Seller's twenty-five (25) largest payors, measured by percentage of revenue (for the trailing previous twelve (12)-month period ending April, 2013). To the knowledge of Seller, as of the date hereof, no distributor, payor, wholesaler, customer, supplier or other Person with a material business relationship with Seller has any intention to cease or substantially reduce the use or supply of products, goods or services of or to the Business or return any products of the Business.

6.17   <u>Disclosure</u>. Seller is not an employee or consultant for another pharmacy, nor does Seller have a direct or indirect interest in any other business. No representation or warranty by Seller in this Agreement contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein not misleading.



## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Seller and agrees as follows:

7.1.    Organization and Authority.    Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois and has the corporate power and other authority to execute, deliver and perform this Agreement. When fully executed and delivered, this Agreement and all documents and agreements required to be delivered hereunder, will be legal, valid and binding obligations of Buyer enforceable in accordance with their terms, in each case subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general application relating to or affecting creditors' rights and to general equity principles.

7.2.    No Conflicts.  The execution, delivery and performance of this Agreement by Buyer does not and will not constitute a breach of any contract to which it is a party, the effect of which breach could reasonably be expected to have an adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.  There is no action, suit or proceeding pending, or to the best of Buyer's knowledge, threatened against Buyer, in any court or agency which would in any way affect Buyer's ability to enter into this Agreement.

## ARTICLE VIII

## ADDITIONAL AGREEMENTS OF THE PARTIES

8.1    Operation of the Pharmacies before Closing.  Between the date hereof and the Closing Date, Seller shall operate each Pharmacy only in the ordinary course and substantially as presently operated. Consistent with the foregoing, Seller shall keep and maintain the Purchased Assets in good operating condition and repair through the Closing Date.  Seller shall protect and preserve the integrity of all patient information, instituting all reasonably necessary safeguards to ensure that such patient information and other confidential information is delivered to Buyer through the Closing Date.  In furtherance of the foregoing, unless otherwise agreed to by Buyer, between the date of this Agreement and the Closing Date:

(a)    Seller shall take all steps reasonably necessary to maintain the Current Volume of each Pharmacy and shall maintain each Pharmacy's normal operating hours, staffing levels, inventory levels and merchandise mix, subject to normal workplace practices and discipline.

(b)    Seller shall (i) preserve the goodwill of the suppliers, contractors, licensors, employees, customers, payors, Payment Programs, referral sources, doctor groups, hospitals, distributors and others having business relations with each respective Pharmacy, and (ii) promptly inform Buyer in the event that Seller has reason to believe that its relationship with



any such Person has been materially reduced or terminated or may be in jeopardy of being so reduced or terminated.

(c)     Except as expressly contemplated by this Agreement or except with the express written approval of Buyer, Seller shall not: (i) take any action that is intended or may reasonably be expected to result in (A) any of the representations and warranties set forth in this Agreement being or becoming untrue in any material respect, (B) any of the conditions to the Closing set forth in this Agreement not being satisfied, or (C) any violation of any provision of this Agreement, except, in each case, as may be required by applicable law; (ii) enter into any contract with respect to, or make any increase in (or commitment to increase) the compensation payable to any of its employees or agents located at or related to any of the Premises; or (iii) sell, lease, transfer or otherwise dispose of (including any transfers from the Seller to any of its Affiliates or employees), or impose or suffer to be imposed any Encumbrance on, any of the Purchased Assets, including patient and other confidential information, other than minor amounts of pharmaceutical inventory sold or otherwise disposed of for fair value in the ordinary course of the each respective Pharmacy's business consistent with past practice.

(d)     Seller shall take all reasonably necessary steps to obtain the Lease Transfer Documents from the Landlord and to otherwise satisfy the conditions required to be satisfied prior to Closing. Buyer agrees to cooperate with Seller as may be reasonably necessary in connection therewith; provided, that Buyer shall not be required to offer or grant financial or other accommodations to any third party to secure any such consent.

(e)     At least forty-five (45) days prior to Closing, Seller shall provide to Buyer complete and accurate copies of all Permits referenced in Section 2.1(g).

8.2 Employees.  Unless otherwise agreed to by Buyer, between the date of this Agreement and Closing, Seller shall (i) continue to employ each of the Business Employees in each Pharmacy, subject to normal workplace practices and discipline, (ii) not transfer the Business Employees or offer the Business Employees an employment position outside of their respective Pharmacy, provided, however, in the event Buyer offers employment to a Business Employee and such Business Employee does not accept employment with Buyer, such Business Employee may seek employment with Seller, provided, however, Seller shall not employ any such Business Employees without Buyer's prior written consent, which shall not be unreasonably withheld (iii) not enter into any contract with respect to, or make any increase in (or commitment to increase) the compensation payable to any of the Business Employees and (iv) promptly inform Buyer in the event that any Business Employee has terminated or will be terminating his or her employment at any such Pharmacy.

(a)     Between the date hereof and Closing, Buyer may interview some or all of Seller's employees to determine whether to offer employment to any of them. Buyer shall have no obligation to hire any Business Employee. Any employees who accept Buyer's offer of employment (each, a "Transferred Employee") shall be employed on terms to be determined by Buyer in its sole discretion. Any Transferred Employee will be deemed terminated by Seller and hired by Buyer, effective upon the hiring of such



employee by Buyer. Any Business Employee who is not a Transferred Employee will be terminated or retained by Seller, in their discretion.

(b)    Nothing herein contained shall be considered or construed as an agreement to employ any Business Employee for any period of time. Buyer assumes no obligation with respect to any of Seller's employees, whether hired by Buyer or not, for any benefit, perquisite or remuneration accrued or earned while under Seller's employment. Without limiting the generality of the foregoing, Buyer shall have no obligation or liability for such employees' accrued vacation time, bonuses, awards, commissions, salaries, reimbursements of any kind, health or disability benefit, insurance, severance pay, pension or profit sharing interests or any other benefits, compensation or remuneration of any nature whatsoever. At Closing and at thirty (30) days after Closing, Seller agrees to provide Buyer with a list of each Transferred Employee's health insurance deductible and amount of the deductible that has been met by such Transferred Employee in the current calendar year, through the date of Closing.

8.3    Record Data; Patient Notification. The parties agree that the Seller will engage Infowerks (the "Data Converter") to convert the Seller's electronic records of prescription files, patient records and other data specified on Exhibit D (the "Record Data") to a format specified by Buyer. Seller agrees to provide such access, information and cooperation to the Data Converter as may be required to enable the Data Converter to deliver the Record Data to Buyer at least two (2) weeks prior to the Anticipated Closing Date.

(a)    The Seller will retain a complete copy of all Record Data in accordance with applicable record retention laws and regulations. In addition, Seller agrees to make the computer hardware, computer software and electronic data currently used for record keeping purposes available to the Buyer for a period of six (6) months from the date of closing at no cost to Buyer. Seller will retain a complete copy of all Record Data in accordance with applicable Requirements of Law regarding retention of records.

(b)    Seller shall permit Buyer to place a sign at the front entrance to each of the Premises advising customers that the respective Pharmacy will be sold to Buyer at least seven (7) days prior to the Closing Date.

(c)    The parties will engage Tribune Direct or another distributor selected by Buyer (the "Third Party Distributor") to notify (i) each customer of each respective File Transfer Pharmacy who has had a prescription filled or refilled at each respective File Transfer Pharmacy within the two (2) years prior to the respective Closing Date, and/or (ii) each customer of each respective Operate Pharmacy who has had a prescription filled or refilled at each respective Operate Pharmacy by mailing each of them a letter in the respective form attached as Exhibit J. The parties agree that, promptly after its receipt of the Record Data, the Data Converter will provide the Record Data to the Third Party Distributor in order to enable the Third Party Distributor to assemble and distribute these letters no sooner than the respective Closing Date.



8.4 <u>Telephone Numbers</u>.  If, prior to Closing, Buyer informs the Seller that it is electing not to assume ownership of the Seller's telephone lines, then upon Closing, the Seller shall (a) disconnect existing telephone lines and terminate any existing telephone accounts, including advertising and yellow pages agreements, for each respective Pharmacy, and (b) arrange for call referral for all calls to the number so canceled to a Walgreen drug store or other location designated by Buyer.  There shall be no charge to Buyer for such call referral service, and Seller shall pay all telephone charges and billings arising from the number canceled by Seller.

8.5 <u>Matters Related to Prescriptions</u>.  Prior to the Closing, Seller shall use reasonable efforts to fill and deliver to pharmacy customers any partial-fill prescriptions with a remaining quantity balance ("<u>IOU Prescriptions</u>").  For any IOU Prescriptions remaining on the Closing Date, Seller shall credit the prescription to the customer or to the third-party payor, as appropriate, on the Closing Date.  Buyer assumes no liability for IOU Prescriptions.  In addition, prior to the Closing, Seller shall reverse and return to stock any filled prescriptions that have not been picked up, providing all necessary notice to any third-party payors, and shall provide Buyer with a list of such prescriptions so that Buyer is prepared to fill such prescriptions on or after the Closing Date.

8.6 <u>Compliance with Law</u>.  The parties agree to comply fully with the provisions of the United States Controlled Substance Act of 1970, as such act may relate to the transfer of the Purchased Inventory, and with all applicable state laws as they may relate to the transfer of the Purchased Inventory.  Seller shall notify the appropriate governmental agencies, including the appropriate State Board of Pharmacy or similar office and the regional office of the DEA, of the transactions contemplated by this Agreement.

8.7 <u>Protected Health Information</u>.  Seller agrees to provide Buyer with a record of any disclosures made by the Seller of Protected Health Information ("<u>PHI</u>") related to the Purchased Assets that resulted in a breach, as that term is defined in HIPAA, since April 14, 2003.

8.8 <u>Taxes</u>. Seller shall be liable for and shall pay all Taxes (whether assessed or unassessed) applicable to the Business or the Purchased Assets, in each case attributable to periods (or portions thereof) ending on or prior to the Closing Date.  Buyer shall be liable for and shall pay all Taxes (whether assessed or unassessed) applicable to the Business or the Purchased Assets, in each case attributable to periods (or portions thereof) beginning on or after the Closing Date.  Notwithstanding the foregoing, any tax (including a sales tax, use tax, real property transfer or gains tax, or documentary stamp tax) attributable to the sale or transfer of the Purchased Assets shall be paid by Seller.

8.9 <u>Access to Information</u>.  Seller shall afford to the officers, employees and authorized representatives of Buyer reasonable access during normal business hours, upon reasonable advance notice, to the offices, properties, employees and business and financial records of the Business to the extent Buyer shall reasonably deem necessary and shall furnish to Buyer or its authorized representatives such additional information concerning the Business as shall be reasonably requested.



8.10  Further Assurances.    The parties agree to take all steps as may be reasonably necessary to put Buyer in actual possession and control of all the Purchased Assets. From time to time following Closing, Seller shall execute and deliver to Buyer such instruments of conveyance and transfer as Buyer may reasonably request or as may be otherwise necessary to more effectively convey and transfer to, and vest in, Buyer and put Buyer in possession of, any part of the Purchased Assets.

8.11  Remittance.    The parties agree that (a) in the event Buyer receives payment from any parties for services rendered by the Seller before the Closing Date with respect to any of the Pharmacies (including payment from Medicare and Medicaid programs), Buyer will remit such payment to the Seller as soon as reasonably practicable after receipt thereof (but in no event later than fifteen (15) days), and (b) in the event the Seller receives payment from any parties for services rendered by Buyer after the Closing Date with respect to any of the Pharmacies (including payment from Medicare and Medicaid programs), the Seller will remit such payment to Buyer as soon as reasonably practicable after receipt thereof (but in no event later than fifteen (15) days).

8.12  Access Through Closing Date.    Immediately after the date hereof and until the Closing, upon reasonable advance notice, (unless mutually agreed), and at an agreeable time and with as little disruption as possible to the Business, Seller shall afford Buyer and its representatives access to all of the Premises, to audit the Seller's prescription records to verify the then-current average daily prescription count, to prepare for the transition and integration of the Business and to review the Purchased Assets.    The Seller shall provide to Buyer such information and documents concerning the Business as reasonably may be requested by Buyer. In addition, from the date hereof and through the Closing, upon reasonable advance notice, (unless mutually agreed), and at an agreeable time and with as little disruption as possible to the Business the Seller shall permit Buyer access to all of the Premises in order to install wiring and equipment for communication devices and other store systems and to prepare for the integration of the Business with Buyer's own business, all at Buyer's cost and without causing material damage to any of the Premises.    If this Agreement is terminated and the Closing Date shall not have occurred, Buyer shall remove all such wiring and equipment at its sole cost and expense. Buyer agrees to repair any damage which may be caused due to the exercise of its rights or the performance of its obligations pursuant to this Section 8.12 and to indemnify, defend and hold harmless the Seller from any and all Losses arising out of or in any way connected with Buyer's exercise of its rights pursuant to this Section 8.12.    In exercising its rights under this Section 8.12, Buyer shall not unreasonably interfere with the Business and shall coordinate the exercise of such rights through the Seller and Buyer shall act diligently to conduct such installations and integrations as promptly as reasonably practicable.

8.13  Licenses.    After the Closing, Buyer shall have the non-exclusive right to use any and all tradenames and trademarks associated with each Pharmacy (to the extent not included in the Purchased Assets for whatever reason and to the extent not containing a trademark or trade name of Seller) in connection with store signage, advertisements, solicitations, announcements and similar matters; provided, that such period shall be extended to the extent necessary if re-branding is not permitted by the applicable Requirements of Law before the expiration of such period.    After Closing, Buyer shall be permitted to continue using



existing store signage located at each of the Premises.  In addition, after the Closing Date, Buyer shall have the right to use existing packaging, labeling, containers, supplies, advertising materials and any similar materials, to the extent Buyer has purchased such materials from the Seller. Buyer shall comply with all applicable Requirements of Law in any use of such packaging or labeling.

      8.14   <u>Restrictive Covenants</u>.

      (a) For a period of five (5) years after the Closing Date or for the maximum time permitted by applicable law, whichever is shorter and except as otherwise expressly consented to by Buyer, Seller and its Affiliates agree not to own or operate any retail outpatient pharmacy or other retail pharmacy business which competes with any Pharmacy's business as conducted by Buyer after the date hereof, within a radius of twenty-five (25) miles of each of the Premises.  Notwithstanding the provisions set forth in this <u>Section 8.14(a)</u>, the parties agree that Seller may continue to operate the existing businesses identified on Exhibit L attached hereto (collectively the "<u>Excluded Businesses</u>"), provided, however, such Excluded Businesses shall be conducted in the same manner as operated as of May 10, 2013 the date of the executed letter of intent ("<u>LOI</u>").

      (b) For a period of five (5) years after the Closing Date, Seller and its Affiliates agree to not, directly or indirectly, (i)  with respect to outpatient retail pharmacy business, call upon, solicit, write, direct, or divert any customer of Seller whose prescription files were acquired by Buyer hereunder, or (ii) use or permit any Person to use the trademarks and trade names used in the operation of the Business , with the exception of trade marks and trade names of the Seller not related to the Business.

      (c) Except as otherwise provided herein, between the date of this Agreement and twelve (12) months after the Closing Date, neither Seller nor its Affiliates shall directly solicit, recruit or hire any Business Employee who becomes a Transferred Employee and shall not directly encourage any such employee to leave the employment of Buyer; provided, that the provisions of this <u>Section 8.14(c)</u> shall not apply with respect to any employee who responds to a public advertisement by Seller.  Provided, further, in the event a Transferred Employee leaves Buyer's employment, Seller or Seller's Affiliates may offer employment to such Transferred Employee, subject to Buyer's prior written consent.

      (d) Seller covenants and agrees that it shall not and that it shall use reasonable efforts to ensure that its Affiliates do not, divulge to any Person any Confidential Information of Buyer or the Business.

      (e) The parties hereby recognize, acknowledge and agree that the territorial and time limitations contained in this Agreement are reasonable and properly required for the adequate protection of the business to be conducted by Buyer with the Purchased Assets.  The parties further agree that the geographical and temporal restrictions referred to in this <u>Section 8.14</u> are divisible and severable.  The parties acknowledge that inclusion of this <u>Section 8.14</u> in the Agreement is a material inducement to Buyer to enter into this Agreement and pay the Purchase Price.



(f)  The parties hereto agree that any breach or threatened breach by Seller of any covenant contained in this <u>Section 8.14</u> would result in substantial and irreparable damage to Buyer, the amount of which would be difficult, if not impossible, to ascertain.  Therefore, Seller agrees that in the event of any such breach or threatened breach thereof, Buyer shall have the right to enforce this <u>Section 8.14</u> by preliminary or permanent injunctive or other relief in equity, without the necessity of proving any actual damages or providing any bond or other security. The right of Buyer to obtain injunctive or other equitable relief to enforce the terms hereof shall be in addition to all other rights and remedies it may otherwise have at law, in equity, or otherwise.  Such right to obtain injunctive or other equitable relief may be exercised, at the option of Buyer, concurrently with, prior to, after, or in lieu of the exercise of any other rights or remedies which Buyer may have as a result of any breach or threatened breach of any of the terms hereof.  The prevailing party or parties in any action brought to enforce any provision of this <u>Section 8.14</u> shall be entitled to recover all reasonable attorneys' fees and disbursements and other out-of-pocket costs incurred in connection therewith.

(g)  Notwithstanding the provisions of this <u>Section 8.14</u>, Seller may purchase or otherwise acquire, up to a non-controlling interest, of any class of securities of any enterprise that may be competitive with Buyer and the Pharmacy (but without other participation in the activities of such enterprise) as long as such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934, as amended.

8.15   <u>Avoiding Abandonment of Business and Patients</u>.   Seller shall reasonably cooperate with Buyer as deemed necessary by Buyer to enable Buyer to conduct the Business after Closing in substantially the same manner as the Business is being currently operated without loss of patient information and without interruption of service to patients or Payment Programs, billing or collection, or other material aspect of the Business.   In furtherance of the foregoing:

(a)   Seller hereby authorize Buyer to operate under each Permit related to the Business after the Closing, to the extent permitted by applicable law, rule or regulation and to the extent necessary to enable Buyer to conduct the Business while Buyer seeks to replace such Permit with its own license, authorization, permit or waiver (such Permits, the "<u>Transferable Permits</u>").  Buyer shall promptly after execution of this Agreement prepare and submit the necessary applications to the applicable regulatory agencies, including the appropriate State Board of Pharmacy and the DEA, to obtain the licenses required  to operate the Business.  Seller will take all steps reasonably necessary to maintain its authorizations under the Transferable Permits that Buyer operates under during the period between Closing and the issuance of Buyer's own licenses, authorizations, permits or waivers.

(b)   The parties further agree that, prior to the Closing, they will cooperate as may be reasonably necessary to enable Buyer to (i) transition all acquired patient files and other confidential information to Buyer, (ii) obtain either a new license or the approval of the transfer of Buyer' existing license issued by the State Board of Pharmacy,



and (iii) obtain any required Medicare or Medicaid authorizations or numbers, NCPDP numbers and DEA authorizations, permits or licenses.

(c)     Fourteen days prior to the Closing Date, Seller shall execute a power of attorney, in the form of Exhibit G, authorizing Buyer to operate the Business under the Transferable Permits (the "Power of Attorney") and such other powers of attorney, pharmacy management and other agreements; assignments, amendments, addenda and other documents as may be necessary to enable Buyer to conduct the Business, in each case as are reasonably requested by Buyer.

(d)     Fourteen (14) days prior to the Closing Date, Seller shall execute the NCPDP Termination Notification attached hereto as Exhibit H and deliver one (1) copy to Buyer and one (1) copy to the NCPDP. In the event the Closing does not occur on the date set forth on the NCPDP Termination Notification, Seller and Buyer shall cooperate as reasonably necessary to cancel such notification.

(e)     Buyer shall promptly reimburse Seller for any out-of-pocket expenses incurred by Seller in connection with their cooperation under this Section 8.15.

8.16     Post-Closing Continuation of Employee Incentives. For the three (3) year period following the Closing Date (the "Benefit Period"), Seller hereby guarantees that Seller's pharmacy benefit plan design (the "Plan Design") shall feature each of the following five (5) Walgreen Co. stores located at (i) 1631 Dual Highway, Hagerstown, Maryland 21740 (ii) 17703 Virginia Avenue, Hagerstown, Maryland 21740, (iii) 11110 Medical Campus Road, Hagerstown, Maryland, (iv) 324 East Antietam Street, Hagerstown, Maryland, and (iv) 13424 Pennsylvania Avenue, Suite 102, Hagerstown, Maryland as their preferred pharmacy (collectively the "Preferred Locations"), regardless of Seller's selected Pharmacy Benefit Manager. Furthermore, Seller hereby agrees to offer discounted co-pays to those Meritus employees who fill their prescriptions at a Preferred Location at an amount that is not less than forty percent (40%) lower than the co-pay such Meritus employees would be entitled to at all other in-network or out-of-network pharmacies. In the event that Seller's Plan Design is modified or changed in any way to lower such co-pay offered to such Meritus employees to an amount lower than forty percent (40%) than the co-pay such Meritus employees would be entitled to at all other in-network or out-of-network pharmacies or feature another pharmacy in addition to Walgreen Co. pharmacies at any time during the Benefit Period, Seller shall reimburse Buyer an amount equal to twenty percent (20%) of the Base Amount within five (5) business days of notice by Buyer to Seller by wire transfer of immediately available funds to an account or accounts determined by Buyer. The parties further agree that in the event Buyer initiates any modification to the pricing provisions to its proposed Network Enrollment Form to the Caremark Agreement at any time after its execution between the parties thereto during the Benefit Period so as to change the related pricing provisions therein, Buyer shall pay to Seller an amount equal to twenty percent (20%) of the Base Amount within five (5) business days of notice by Buyer to Seller pursuant to Seller's wire transfer instructions provided herein



# ARTICLE IX

## BULK SALES; LIENS

9.1    UCC Searches.    Buyer may conduct Uniform Commercial Code searches of state and county records.  Any Encumbrances disclosed by any such search shall be released in full prior to Closing.  Seller shall provide Buyer with all Notices of Termination of such Encumbrances from such holders of such Encumbrances (if any).  Buyer shall retain any portion of the Purchase Price needed to satisfy any Encumbrances that have not been satisfied by Seller prior to Closing.  In the event the portion of the Purchase Price required to satisfy any Encumbrances exceeds the Base Amount, then Seller shall remit Buyer the amount of such deficiency at or prior to Closing.

9.2    Bulk Sales.  (a) Seller has or will as promptly as possible after the date hereof provide Buyer with a list, signed and sworn to or affirmed by Seller or its agent, of the Seller's creditors related to the Pharmacy.  This list shall set forth the name and business address of each such creditor, the amount owed to such creditor and whether the creditor is a general or secured creditor, and shall also include the names of all Persons who are known to Seller to have any claims against Seller even though such claims may be contingent or disputed.

(b)    The Seller shall or has prepared a schedule of the Purchased Assets transferred under this Agreement sufficient to identify them in reasonable detail.  Buyer shall preserve this schedule of Purchased Assets and the list of creditors contemplated by this Section 9.2 for six months after Closing, during which time it shall permit inspection and copying of either or both at all reasonable hours by any creditor of the Seller.  At least ten days before Buyer takes possession of the Inventory, Buyer shall give notice of the transfer personally or by registered or certified mail to all Persons shown on the list of creditors furnished by the Seller.  The contents of such notice shall conform to the requirements of Section 6-101 thru Section 6-110 of the Maryland Uniform Commercial Code.  In the event that the Seller fails to comply with these requirements, then Buyer may, at its option, terminate this Agreement.  It is the intention of this paragraph that the Seller shall be required to fully comply with Section 6-101 thru Section 6-110 et seq. of the Maryland Uniform Commercial Code as now in effect, and that the aforesaid specification of requirements shall not be deemed to limit the Seller's duties under the Uniform Commercial Code.

# ARTICLE X

## INDEMNIFICATION

10.1    Indemnification by Seller.    Seller agrees to indemnify, defend and hold harmless Buyer, its Affiliates, directors, officers, employees and agents  from and against any and all Loss and Expense incurred by any of them in connection with or arising from: (a) any breach by Seller of any of its representations or warranties in this Agreement or in any agreement or document required to be delivered by Seller hereunder; (b) any breach by Seller of any of its covenants, agreements or obligations in this Agreement or in any agreement or document

required to be delivered by Seller hereunder; (c) any Excluded Liability; (d) any claim, suit or action brought or asserted by any creditor, claimant, Governmental Body or other Person asserting a claim against Buyer or against any of the assets to be conveyed hereunder, related to the Business and arising as of or before the Closing Date, whether such claim is presently known or unknown, choate or inchoate; (e) the acts or omissions of Seller or its Affiliates, employees, agents and contractors, in connection with the transactions contemplated by this Agreement; and (f) any claims for brokerage commissions or compensation arising out of the negotiation and execution of this Agreement.   Such provisions are subject to the prompt notification by Buyer to Seller of any claims that may give rise to a liability in this Section 10.1 and the reasonable cooperation of Buyer, Seller shall solely select counsel, subject to applicable conflict of interest rules and other ethical considerations, and shall not, without Buyer's consent,  admit the liability of Buyer in any proceeding or settlement.

10.2   Indemnification by Buyer.   Buyer agrees to indemnify, defend and hold harmless Seller, its Affiliates, directors, officers, employees and agents from and against any and all Loss and Expense incurred by any of them in connection with or arising from: (a) any breach by Buyer of any of its representations or warranties in this Agreement or in any agreement or document required to be delivered by Buyer hereunder; (b) any breach by Buyer of any of its covenants, agreements or obligations in this Agreement or in any agreement or document required to be delivered by Buyer hereunder; (c) any Assumed Liability; (d) the acts or omissions of Buyer or its Affiliates, employees, agents and contractors, in connection with the transactions contemplated by this Agreement; and (e) without limiting Buyer's rights to indemnification under Section 10.1, the conduct or operation of the Business by Buyer or any of its Affiliates after Closing.   Such provisions herein are subject to the prompt notification by Seller to Buyer of any claims that may give rise to a liability in this Section 10.2 and the full cooperation of Seller, Buyer shall solely select counsel and shall not, without Seller's consent, admit the liability of Seller in any proceeding or settlement.

## ARTICLE XI

## CONDITIONS TO CLOSING

11.1   Seller's Conditions to Closing.   The obligations of Seller under this Agreement shall, at the option of Seller, be subject to the satisfaction, on or prior to the Closing Date, of the following conditions: (a) Buyer shall have delivered all of the documents or other information required to be delivered by Buyer hereunder; (b) there shall have been no material breach by Buyer in the performance of any of its covenants and agreements herein which shall not have been remedied or cured; and (c) each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on the Closing Date as though made on the Closing Date, except for changes therein specifically permitted by this Agreement or resulting from any transaction expressly consented to in writing by Seller or any transaction contemplated in this Agreement.

11.2   Buyer's Conditions to Closing.   The obligations of Buyer under this Agreement shall, at the option of Buyer, be subject to the satisfaction, on or prior to the Closing Date, of the following conditions: (a) Buyer shall have obtained all licenses, permits, NCPDP



numbers, Medicaid or Medicare numbers, or similar items required to operate the Business (either by transfer of Seller's existing licenses, permits or numbers or its receipt of new licenses, permits or numbers); (b) Seller shall have delivered all of the documents or other information required to be delivered by Seller hereunder (including fully executed Assumed Leases and Lease Transfer documents for each Operate Premises); (c) there shall have been no material breach by Seller in the performance of any of its covenants and agreements herein which shall not have been remedied or cured; (d) each of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on the Closing Date as though made on the Closing Date, except for changes therein specifically permitted by this Agreement or resulting from any transaction expressly consented to in writing by Buyer or any transaction contemplated in this Agreement; (e) there shall not have been a material adverse change in the Purchased Assets or the Business, or the financial condition, results of operations or prospects of the Business (or any event or condition that would, with the passage of time, reasonably be expected to constitute such an effect or change); (f) there shall have been delivered to the Buyer a certificate confirming that subsections (c) and (d) have been complied with, dated as of the Closing Date, signed by a duly authorized officer of the Seller; (g) Buyer shall have completed, to its reasonable satisfaction, its due diligence review; (h) Buyer shall have completed a site visit, to its reasonable satisfaction, of each of the Premises; (i) Buyer shall have had an opportunity to interview the Business Employees pursuant to Section 8.2(a); (j) fourteen (14) days prior to the Closing Date, Seller shall have delivered to Buyer the Power of Attorney, duly executed by an authorized officer of the Seller; (k) fourteen (14) days prior to the Closing Date, Seller shall have delivered to Buyer, the NCPDP Termination Notification attached hereto as Exhibit H, duly executed by an authorized officer of the Seller; (l) within five (5) business days following Seller's announcement to its Business Employees of the transactions contemplated hereunder, Seller shall have delivered to Buyer, the Letter of Agency attached hereto as Exhibit I, on letterhead that matches the name on the phone company account and duly executed by an authorized officer of the Seller; (m) Buyer shall have received a duly executed agreement from Caremark and Buyer as contemplated by Section 8.16 hereto; (n) Seller shall amend the existing lease for the Operate Premises located at 13424 Pennsylvania Avenue, Hagerstown, Maryland, to remove the pharmacy space from the lease;  (o) Buyer shall have entered into the New Lease Agreement on the terms and conditions reasonably acceptable to Buyer for the pharmacy space; and (p) prior to the Closing Date Seller shall have terminated the website      www.meritushealth.com/Directory-of-Services/Featured-Services/Home-Care-Pharmacy.aspx, and removed all references to such website.

## ARTICLE XII

## TERMINATION

12.1     Termination.  Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing Date:

(a)     by the mutual written consent of Buyer and Seller;

(b)     by Buyer in the event of any breach by Seller of any of Seller's agreements, covenants, representations or warranties contained herein;

(c)     by Seller in the event of any breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein;

(d)     by Buyer if, at any time between the date of this Agreement and the Closing Date, the average daily prescription count at any of the Pharmacies falls below ninety five percent (95%) of the average count for the same four week period in the previous year; such calculation shall be based upon the total Current Volume of all Pharmacies;

(e)     by either Buyer or Seller if any Governmental Body shall have issued a final and non-appealable order, decree or ruling permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(f)     by either Buyer or Seller if the Closing shall not have occurred on or before a date that is forty-five (45)-days following the Anticipated Closing Date (or such later date as may be mutually agreed to in writing by Buyer and Seller); provided that the party seeking to exercise such right of termination has not breached its obligations hereunder; or

(g)     by Buyer, in the event that any Schedule to this Agreement delivered to Buyer after the date hereof contains any disclosure that would materially impair the operation of the Business after Closing or is otherwise unacceptable to Buyer, in its reasonable discretion.

12.2    Rights on Termination.    In the event that a party terminates this Agreement, all further obligations of the parties under this Agreement shall be terminated without further liability of any party or its stockholders, directors or officers to the other parties, provided, (a) that this Section 12.2 and Sections 13.2, 13.7 and 13.11 shall survive any such termination, and (b) that nothing herein shall relieve any party from liability or damages for its willful breach of this Agreement.

## ARTICLE XIII

## GENERAL PROVISIONS

13.1    Survival of Obligations.    All representations, warranties, covenants and obligations contained in this Agreement shall survive the consummation of the transactions contemplated by this Agreement.

13.2    No Public Announcement.    Seller shall not, without the approval of Buyer, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that Seller shall be so obligated by law, in which case Seller shall advise Buyer and the parties shall use their best efforts to cause a mutually agreeable release or announcement to be issued.

13.3    Notices.    All notices hereunder shall be in writing and sent by United States certified or registered mail, postage prepaid, addressed, (a) if to Seller, Attention: Vice President and General Counsel, Meritus Medical Center, Inc., 11110 Medical Campus Way, Suite 229, Hagerstown, Maryland 21742, and (b) if to Buyer, to 104 Wilmot Road, MS#1425, Deerfield, Illinois 60015, Attention:    Law Department (JDC & JLE), email:

john.curtin@walgreens.com and jaimie.erickson@walgreens.com, provided that each party by like notice may designate any further or different addresses to which subsequent notices shall be sent.

13.4    <u>Successors and Assigns; No Third Party Beneficiaries</u>.    Following the Closing, either party may assign any of its rights hereunder, but no such assignment shall relieve it of its obligations hereunder. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns.    Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this <u>Section 13.4</u> any right, remedy or claim under or by reason of this Agreement.

13.5    <u>Entire Agreement; Amendments</u>.    This Agreement and the Exhibits and Schedules referred to herein and the documents delivered pursuant hereto contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or letters of intent between or among any of the parties hereto, including any confidentiality agreement between the parties or their Affiliates. This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the parties hereto.

13.6    <u>Waivers</u>.    Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any party, it is authorized in writing by an authorized representative of such party. The failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

13.7    <u>Expenses</u>.

(a)    Except in the event of termination due to breach, each party hereto will pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants.

(b)    The parties acknowledge and agree that the expenses associated with retaining (i) the Inventory Service, as contemplated by <u>Section 3.2</u>, and (ii) Data Converter, as contemplated by <u>Section 8.3</u>, are incurred for the mutual benefit of the parties solely in order to facilitate the transactions contemplated by this Agreement.    For administrative convenience, Buyer agrees to pay and be liable for the Shared Expenses. In consideration therefore, the parties agree that Buyer will be reimbursed, through a credit against the Purchase Price for each Pharmacy in the amount of Two Thousand Two Hundred Dollars and No/100 ($2,200.00) (the "<u>Shared Expense Credit</u>").



13.8   Partial Invalidity.   Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

13.9   Injunctive Relief; Remedies.   The parties agree that any breach or threatened breach by Seller of or its Affiliates of this Agreement, including Section 8.14, would result in substantial and irreparable damage to Buyer, the amount of which would be difficult, if not impossible, to ascertain.   Therefore, Seller agrees that in the event of any such breach or threatened breach thereof, Buyer shall have the right to enforce this Agreement by preliminary or permanent injunctive or other relief in equity, without the necessity of proving any actual damages or providing any bond or other security.   The right of Buyer to obtain injunctive or other equitable relief to enforce the terms hereof shall be in addition to all other rights and remedies it may otherwise have at law, in equity, or otherwise.   Such right to obtain injunctive or other equitable relief may be exercised, at the option of Buyer, concurrently with, prior to, after, or in lieu of the exercise of any other rights or remedies which Buyer may have as a result of any breach or threatened breach of any of the terms hereof.   The prevailing party or parties in any action brought to enforce any provision of this Agreement shall be entitled to recover all reasonable attorneys' fees and disbursements and other out-of-pocket costs incurred in connection therewith.

13.10   Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement.   Original signatures transmitted by facsimile or .pdf shall be sufficient and binding upon the parties hereto.

13.11   Governing Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland, including all matters of construction, validity, performance and enforcement.

13.12   Risk of Loss.   The risk of loss or damage to the assets described in Section 2.1 hereof shall be upon the Seller until Buyer receives physical possession of such assets in accordance with this Agreement.

13.13   Acknowledgement Regarding Representation.   Seller acknowledge that: (a) it has consulted with or has had an opportunity to consult with independent counsel of its choice concerning this Agreement and the transactions contemplated hereby and has been advised to do so by Buyer; and (b) has read and understood this Agreement, is fully aware of its legal effect, and has entered into it freely based on its own judgment.

\* \* \* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed the day and year first above written.

**BUYER:**
**WALGREEN CO.**


By: _____
       Name:
       Title:

**SELLER:**
**MERITUS ENTERPRISES, INC.**


By: _____
       Name:  Joseph P. Ross
       Title:   President and CEO

33

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed the day and year first above written.

**BUYER:**
**WALGREEN CO.**

By: _____
Name: Joseph Greenberg
Title: Divisional Vice President

**SELLER:**
**MERITUS ENTERPRISES, INC.**

By: _____
Name: Joseph P. Ross
Title:   President and CEO

33